**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| **MICHAEL GOODRUM,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **No. 1:18-cv-0007** |
| **v.** | ) | |
| | ) | **CHIEF JUDGE CRENSHAW** |
| **DARREN SETTLES,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**<u>MEMORANDUM OPINION</u>**

Michael Goodrum, an inmate of the Bledsoe County Correctional Complex in Pikeville, Tennessee, filed a pro se, in forma pauperis petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his conviction in the Criminal Court of Maury County of possession of .5 grams or more of cocaine with the intent to sell within 1,000 feet of a park, a Class B felony, and possession of .5 grams or more of cocaine with intent to sell within 1,000 feet of a public school, a Class A felony. Petitioner is serving a term of imprisonment of fifteen years in the Tennessee Department of Correction for these offenses. (Doc. No. 1).

Pending before the Court is the Warden's response to the habeas petition in which he asks the Court to dismiss the petition. (Doc. No. 11).

The petition is ripe for review, and this Court has jurisdiction pursuant to 28 U.S.C. § 2241(d). Having fully considered the record, the Court finds that an evidentiary hearing is not needed, and Petitioner is not entitled to relief. The petition therefore will be denied and this action will be dismissed.

## II.    Procedural History

Petitioner's first trial ended in a hung jury.  In 2012, after a second jury trial, Petitioner was convicted of one count of possession of .5 grams or more of cocaine with the intent to sell within 1,000 feet of a park, a Class B felony, and one count of possession of .5 grams or more of cocaine with the intent to sell within 1,000 feet of a public school, a Class A felony. State v. Goodrum, No. M2012-02066-CCA-R3-CD, 2014 WL 1102011 (Tenn. Crim. App. Mar. 20, 2014), perm. app. denied (Tenn. Aug. 29, 2014). The trial court merged the two counts into one conviction and sentenced Petitioner to fifteen years in the Tennessee Department of Correction.  Id.

On direct appeal, the Tennessee Court of Criminal Appeals affirmed Petitioner's conviction and sentence on March 20, 2014.  Id. The Tennessee Supreme Court denied Petitioner's application for discretionary review on April 20, 2014.  Id.

On August 24, 2015, Petitioner filed a timely pro se petition for state post-conviction relief. (Doc. No. 10, Attach. 13 at 13).  Following an evidentiary hearing, the post-conviction court denied the petition. (Id. at 61).  Petitioner filed a timely notice of appeal, and the Tennessee Court of Criminal Appeals affirmed.  Goodrum v. State, No. M2016-00684-CCA-R3-PC, 2017 WL 3149646 (Tenn. Crim. App. Jul. 25, 2017), perm. app denied (Tenn. Nov. 16, 2017). The Tennessee Supreme Court denied Petitioner's application for discretionary review on November 16, 2017.  Id.

On January 19, 2018,[1] Petitioner filed the instant pro se petition for writ of habeas corpus. (Doc. No. 1 at 42).   In his petition, Petitioner asserts five claims for relief:  (1) the trial court erred

---

[1] Under the "prison mailbox rule" of Houston v. Lack, 487 U.S. 266, 270 (1988), and the Sixth Circuit's subsequent extension of that rule in Richard v. Ray, 290 F.3d 810, 812 (6th Cir. 2002) and Scott v. Evans, 116 Fed. App'x 699, 701 (6th Cir. 2004), a prisoner's legal mail is considered "filed" when he deposits his mail in the prison mail system to be forwarded to the Clerk of Court.  Here, Plaintiff signed and dated his complaint on January 19, 2018, although the Clerk's Office did not receive and file the complaint until January 22, 2018.  Under the prison mailbox rule, the Court considers January 19, 2018, as the date of filing.

by excusing Angela Grimes as a potential juror in violation of <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986); (2) the trial court erred by allowing Petitioner's case to be presented to the jury; (3) the evidence is legally insufficient to support Petitioner's conviction; (4) Petitioner received ineffective assistance of counsel; and (5) Tennessee's drug-free school zone law is unconstitutional.

## III.    Summary of the Evidence

### A.    Trial Proceedings

The Tennessee Court of Criminal Appeals summarized the proof adduced at Petitioner's jury trial as follows:

> Officer Jason Dark testified that he has been employed with the Columbia Police Department for the past fourteen years, and specifically in the Narcotics and Vice Division for five years. On July 9, 2008, he was in charge of executing a search warrant at 504 East 9th Street, a residence in Columbia, Tennessee. Raven Fleming and Gary Fleming were named in the search warrant. Officer Dark stated that he and his partner had previously used a confidential informant to conduct a controlled purchase of crack cocaine from this residence. He said the Defendant was not known to the police prior to the execution of the search warrant. After the search took place, the names Raven Fleming, Robert Fitzgerald, and Michael Goodrum were added to the search warrant as individuals to be charged. The search warrant was entered into evidence.
>
> Officer Dark identified a layout of the residence that was prepared by the police after the search. The diagram depicted the living room as the first room upon entering the front door at 504 East 9th Street. On the diagram, Officer Dark drew a couch to the left of the front door. Directly in front of the door, Officer Dark saw a loveseat, which he also marked on the diagram. He marked the location of where the Defendant was secured, between the front door and the loveseat. There was a kitchen directly beyond the living room. The diagram was entered into evidence.
>
> Officer Dark said that when he and his team arrived at the Flemings' residence to execute the search warrant, Trammell Jennings, a known drug dealer, was in the front yard. Jennings saw the police and fled from the scene on foot. Due to this compromise, five or six officers quickly entered the residence through the front door. Upon entry, the officers identified themselves as police and told everyone inside to get on the ground and show their hands. Officers secured the scene and Sergeant Haywood advised the persons inside of their <u>Miranda</u> rights. When Officer Dark entered the residence, he saw the Defendant lying on the living room

floor "just beyond the front door." He also saw Raven Fleming in the living room with the Defendant. Ms. Fleming was lying on the floor in front of the couch. A person named Gary Brown was in the area beyond Ms. Fleming and the Defendant. Robert Fitzgerald, a known drug dealer, was found in the kitchen.

Officer Dark testified that when he first saw the Defendant, Sergeant Haywood was securing him. Officer Dark was preparing the residence for a search when Sergeant Haywood called him over to the area of the Defendant. Officer Dark observed the Defendant on his side and a bag of crack cocaine underneath the chest area where he had been lying. Officer Dark said that Sergeant Haywood searched the Defendant and did not find a crack pipe or anything else for smoking crack cocaine. To Officer Dark's knowledge, the Defendant did not have anything on his person such as a weapon, scales, a cell phone, or substantial currency.

During the execution of the search, the police found a bag of marijuana behind the couch, Xanax pills in Ms. Fleming's bedroom closet, and ecstasy pills on the kitchen counter near where Mr. Fitzgerald was secured. The police also found a crack pipe on Mr. Brown's person, but no drugs. A total of $291 was seized from Ms. Fleming. According to Officer Dark, Ms. Fleming was subsequently charged with possession of marijuana and the Xanax pills; Mr. Fitzgerald was charged with possession of the ecstasy pills; Mr. Brown was charged with possession of the crack pipe; and the Defendant was charged in the case sub judice. Officer Dark testified that the bag found beneath the Defendant was secured as evidence and sent to the Tennessee Bureau of Investigation (TBI) Crime Laboratory for testing. He said the TBI analysis determined the substance to be crack cocaine in the amount of 1.7 grams.

Officer Dark estimated that, throughout his career, he has arrested hundreds of crack cocaine users and close to one hundred people for selling crack cocaine. He typically did not find crack pipes on people arrested for selling crack cocaine. Of the individuals Officer Dark has arrested for using crack cocaine, nearly 100 percent of them had crack pipes. He said that in 2008, the street value of crack cocaine in Maury County was $20 for "crack rocks" at the user level. He was familiar with this figure through his experience as a narcotics investigator and through the use of informants for controlled purchases. Officer Dark said that $20 crack rocks usually weighed .1 grams. He stated that a high-end user might spend $100 for a gram of crack cocaine, but "[o]nce you start getting above a gram, it's usually a dealer buying from a dealer." Of the hundreds of arrests he has made for crack cocaine use, he said that a user would typically be found with a $20 rock, but usually no more than two rocks. In his experience, users do not "save up" crack cocaine for future use. Officer Dark testified that he has viewed videotaped transactions where dealers have sold crack rocks from a larger bag of crack without the use of scales or additional bags and that generally, "it's a quick hand-to-hand transaction." He said that the 1.7 grams of crack cocaine secured from beneath the Defendant's chest would have been the equivalent of 17 crack rocks at a street value of $20 each.

In the course of his investigation, Officer Dark determined that 504 East 9th Street was located within a 1,000 feet radius of both Frierson–Johnson Park and College Hill School. After accessing a computer program used by the city of Columbia in its planning, Officer Dark found the distance between 504 East 9th Street and Frierson–Johnson Park to be 572 feet. He also determined the distance between the residence and College Hill School to be 872 feet. He made his measurements from the front door of the residence to the edge of the property line of the park and the school. Officer Dark personally tested the accuracy of the computer program by using a counter wheel to measure two different points and found the physical and the computer-generated measurements to be exact. He also calibrated the counter wheel with a tape measure. In his fourteen years employed with the Columbia Police Department, Officer Dark testified that sixty-five to seventy percent of his time was spent covering the vicinity of 504 East 9th Street. He identified an aerial map of the area and marked the residence, Frierson–Johnson Park, and College Hill School.

Sergeant Jeremy Haywood of the Columbia Police Department testified that he was part of the entry team during the July 9, 2008 search at 504 East 9th Street. In the three years that he was in the Vice Unit, Sergeant Haywood estimated that he participated in fifty to one hundred searches. In this search, he was the third or fourth person to enter the front door. The first officers who entered identified themselves and told the occupants to "Get on the ground." Upon entry, Sergeant Haywood encountered the Defendant in the living room near the front door. The Defendant was in the process of getting to the floor as ordered. Sergeant Haywood also observed Ms. Fleming make her way from the couch to the floor. Until the scene was secured, Sergeant Haywood remained in the living room and monitored Ms. Fleming and the Defendant as they were lying face down on the floor with their hands at their sides.

Sergeant Haywood subsequently searched the Defendant for weapons and handcuffed him. The Defendant did not have anything in his pockets. Immediately upon rolling the Defendant over on his side, Sergeant Haywood saw "[a] plastic bag with white rock type substance that appeared to be crack cocaine" underneath the Defendant's chest and stomach area. He then called for Officer Dark to come observe the substance. According to Sergeant Haywood,"[the Defendant] was adamant that it wasn't his drugs." He did not see any drugs in the Defendant's hands when he entered the residence. He also did not observe any objects being thrown in the Defendant's direction, either through the air or across the floor. Sergeant Haywood testified that he did not know how the drugs ended up on the floor. He said he would not have been able to observe the Defendant if he had dropped the drugs from his hand and laid on them.

Special Agent Laura Adams, a forensic scientist with the TBI Crime Lab, testified as an expert witness in the identification of controlled substances. In the instant case, Agent Adams analyzed a "rock-like substance" and determined that it

contained cocaine and weighed 1.7 grams. She generated a one-page lab report, which was admitted into evidence.

Mary H. Carter testified that she has been employed with the Maury County school system as a supervisor of attendance and discipline for the past twenty-seven years. She stated that in July of 2008, Horace Porter School at College Hill was a public, alternative school in Maury County.

The Defendant chose not to testify and did not present any proof at trial. Based on the foregoing evidence, the jury convicted the Defendant as charged in the indictment. At a subsequent sentencing hearing, the trial court merged the two counts into one conviction for possession of .5 grams or more of cocaine with the intent to sell within 1,000 feet of a public school. The Defendant was sentenced as a Range I, standard offender to fifteen years' imprisonment, to be served at 100 percent. After the denial of his motion for new trial, this timely appeal followed.

Goodrum, 2014 WL 1102011, at **1-4.

## B.    Post-Conviction Proceedings

The Tennessee Court of Criminal Appeals summarized the proof adduced at Petitioner's

post-conviction evidentiary hearing as follows:

On August 24, 2015, the petitioner filed, pro se, a timely petition for post-conviction relief, alleging, inter alia, that he was deprived of the effective assistance of counsel. Following the appointment of counsel and the amendment of the petition, the post-conviction court conducted an evidentiary hearing on February 5, 2016.

At the evidentiary hearing, trial counsel testified that he was appointed to represent the petitioner in August 2009, shortly after the public defender's office had been removed from the petitioner's case due to an unspecified conflict. Trial counsel successfully petitioned to dismiss the petitioner's initial indictment due to insufficient language regarding the drug-free school zone act. A superseding indictment was later issued, and both of the petitioner's trials were based upon that indictment. Trial counsel testified that he was aware that there had been a "prior incident" in Raven Fleming's house shortly before the incident giving rise to the petitioner's arrest, but trial counsel did not know that Ms. Fleming's residence had been searched and that she had been charged with possession with intent to sell cocaine just three weeks prior to the petitioner's arrest at her house.

Trial counsel provided the petitioner with all of his discovery materials. Trial counsel conceded that he had not independently measured the distance between Ms. Fleming's residence and the park and the school but that he had used an online resource to compare the distances between the relevant points. Counsel believed

that he had checked the licensure of the park in question prior to trial, but he could not recall doing so with any specificity.

Prior to the petitioner's second trial, counsel recalled speaking with the petitioner by telephone and meeting him with him in counsel's office on "at least four different" occasions. Trial counsel conceded that there "were probably some times [the petitioner] would call ... to speak with me" when counsel was unavailable but that he "never refused access to" the petitioner and would work out "a later time" to speak with the petitioner. Trial counsel recalled speaking with both the petitioner's mother and his "girlfriend at the time" but no additional family members. With respect to the petitioner's decision to testify at trial, trial counsel testified that he had discussed the petitioner's options with him until they had "beat[en] that horse to death." Trial counsel acknowledged that he had sent a letter to the petitioner in January 2012, nearly three months prior to trial, advising the petitioner of the potential perils of testifying in the second trial and enclosing a copy of the petitioner's testimony from the first trial. Trial counsel explained the reasoning for the letter as follows:

> [T]he purpose of this letter, there was–I had a copy of the transcript attached to this. I wanted [the petitioner] to be aware of that. I knew if he were to take the stand on trial number two, again, he was under oath, there's [a] detailed document that the State would be able to cross-examine. If he got off track on what he had testified earlier, you know, the State was just going to make mincemeat out of him in front of a jury. Again, if he were ready–and, again, that's his decision, not mine, but if he so chose, you know, again, this was in January. I wanted him to be aware of it, have a chance to review it so there wouldn't be any surprises if, in fact, he decided to testify at the second trial.

Trial counsel stated that he orally advised the petitioner against testifying in the second trial but made it clear to the petitioner that the decision was his alone.

When asked if he had attempted to verify the petitioner's employment or church membership for purposes of mitigation, trial counsel responded that he would not have done so for trial but that he would have for sentencing if he had not been able to successfully negotiate the minimum available sentence for the petitioner. With respect to his failure to file a motion to suppress any evidence, trial counsel questioned the standing the petitioner would have had to seek such a motion, given that he was a visitor in Ms. Fleming's residence and that the search warrant at issue did not appear to be defective. Trial counsel testified that he had prepared a diversion application for the petitioner and that the petitioner had qualified for diversion, which counsel believed was instrumental in his sentencing negotiations with the State. Trial counsel admitted that he had not requested the aid of an investigator in the petitioner's case but stated that he had interviewed both Officer

Jason Dark and Officer Brian Gray and that he had spoken briefly with Sergeant Haywood prior to trial.

With respect to the nature of the petitioner's charges, counsel stated that he could not "recall a time that we did not discuss the severe nature of what [the petitioner] was charged with." Trial counsel recalled that the petitioner did not wish to accept a plea offer because the petitioner "always indicated ... that he was innocent of the charge." Counsel continued as follows:

> We talked actual possession, constructive possession, how hard that was under the circumstances to prevail. [The petitioner] said I'm not guilty. I want–I want to argue my case and that's–that's what I did to the best of my ability.
>
> ....
>
> Based on [the petitioner's] direction to me, he felt that Mr. Fitzgerald was the most culpable individual in the home that night. He felt there was a possibility Mr. Fitzgerald will take the fall or take the blame for what happened to [the petitioner]. Based on that, I sent a letter to [Mr. Fitzgerald's attorney] asking for permission to talk to Mr. Fitzgerald. Again, I did get the discovery. [The attorney] provided me that. In short, [the attorney's] indication to me was nothing good is going to come out of a discussion. He doesn't have anything good to say about [the petitioner]. It's going to be detrimental to his case. I advised [the petitioner] of that and that's the last I heard about Mr. Fitzgerald.

Trial counsel was adamant that the petitioner "was always articulate" and "well-spoken," and counsel saw nothing that would give rise to any competency concerns with the petitioner. Counsel conceded that, near the end of his representation of the petitioner, he had filed a motion to withdraw based on a letter the petitioner had written to the court in which he claimed that counsel had been keeping him "in the dark." Trial counsel testified that the petitioner's contention "was completely not true no matter how you cut it." Nevertheless, trial counsel asked to be relieved and argued the motion before the trial court. At that time, the petitioner "seem[ed] to be satisfied" with counsel's representation, and trial counsel continued to represent the petitioner.

On cross-examination, trial counsel agreed that, prior to the first trial, he had successfully negotiated a plea offer of a best interest plea to a misdemeanor sentence of 11 months and 29 days, all suspended to diversion, even though the petitioner was facing a Class A felony conviction with a mandatory minimum sentence of 15 years to serve. The petitioner rejected the offer, and the first trial ended in a hung jury with 11 jurors voting to convict. Prior to the second trial, the

State made a plea offer of eight years at 30 percent service, but the petitioner again rejected the offer because he was "hoping for something less than that." After the petitioner was convicted at the second trial, trial counsel successfully negotiated the mandatory minimum sentence of 15 years.

CPD Corporal Jason Dark testified that he had executed a search warrant at 504 East Ninth Street on July 9, 2008, and that the search warrant was based on a controlled buy that had occurred 72 hours earlier. Corporal Dark recalled that as Sergeant Haywood rolled the petitioner over to lift him off of the ground, a bag of crack cocaine was discovered beneath the petitioner's body. Corporal Dark recalled speaking with trial counsel about the case. Corporal Dark confirmed that the petitioner could not be excluded as the source who provided Ms. Fleming with cocaine.

CPD Sergeant Jeremy Haywood testified that he had lifted the petitioner off the ground on the date in question. Sergeant Haywood could not recall whether he had spoken with trial counsel about the petitioner's case.

The petitioner testified that he did not have the opportunity to speak with trial counsel very often and that he had sought new counsel because he "was left in the dark" and because counsel failed to "take time to explain" things to the petitioner. The petitioner testified that trial counsel never visited him while he was incarcerated, but the petitioner conceded that he was out on bond for almost four years. According to the petitioner, he drove to trial counsel's office "10 or 15 times" over a period of several months but that he was never able to meet with trial counsel. The petitioner repeatedly insisted that he "didn't understand any of this," that he was unfamiliar with the law, and that he was confused by the concept of constructive possession. The petitioner testified that he "was never laying on top of the drugs" and that Ms. Fleming was "closest to those drugs" when officers discovered them on the floor.

With respect to his rejection of the misdemeanor plea offer, the petitioner insisted that he "didn't have any knowledge of the law whatsoever" and that he "didn't understand the things that [trial counsel] was telling" him. The petitioner conceded that he had "messed up" by not accepting the misdemeanor plea offer. The petitioner admitted that he had received all of his discovery materials and that trial counsel had explained that he was eligible for diversion. The petitioner was adamant that he had never received an offer of eight years, explaining that had he received such an offer, he would have accepted it.

The petitioner stated that trial counsel did not include a copy of his testimony from the first trial when counsel sent the letter advising the petitioner about the perils of testifying in the second trial. The petitioner claimed that he "assume[d]" he would testify in the second trial because he had done so in the first trial but that counsel had informed him "[a]bout 10 minutes before we came into the courtroom [that] it

would be in [his] best interest not to testify." The petitioner testified that he was simply following the advice of his attorney when he chose not to testify.

The petitioner agreed that he wrote a letter to the court clerk seeking new counsel but that he then chose to stay with trial counsel because the trial court had advised him that he "had one of the best lawyers in town."

On cross-examination, the petitioner admitted that he had received a letter from trial counsel dated May 24, 2010, in which counsel informed the petitioner that he could enter a best interest plea to misdemeanor simple possession and receive a sentence of 11 months and 29 days, all suspended to judicial diversion. The letter continued with the following advice:

> My legal advi[c]e to you is to accept the plea as offered. This is the best negotiating I can do on your behalf and should the case be decided by a jury the outcome is uncertain. The benefit to you is 1) no jail time to serve and being placed on diversion for a misdemeanor offense for which you may have expunged from your record at the end of the successful completion of the 11/29; 2) a best interest plea in that you do not admit any wrongdoing; 3) knowing what you have and being able to resume your life without the risk of an adverse jury decision requiring you to serve a minimum of eight (8) years in the penal system.

With respect to his decision not to testify at the second trial, the petitioner acknowledged that he had "the option to testify" and that he had announced in court, following the Momon colloquy, that he did not wish to testify. The petitioner also conceded that he sent a letter to trial counsel nearly six months after he was convicted at the second trial which stated, in pertinent part, as follows:

> Let me start by saying you did me proud in court and I was glad to see your representation on this day because you touched a lot of good points in my case and truthfully this is going to be a waste of the taxpayers['] money.

Brenda Goodrum, the petitioner's mother, testified that trial counsel never contacted her about the petitioner's case. Ms. Goodrum stated that she never came to court during the petitioner's trials even though she was not working at the time, but she claimed that she was unaware that the petitioner was going to court. Ms. Goodrum attempted to contact trial counsel on multiple occasions but was never successful in reaching him. Ms. Goodrum admitted that she had no knowledge of the events surrounding the petitioner's arrest.

With this evidence, the post-conviction court denied relief, finding no clear and convincing evidence that trial counsel had rendered ineffective assistance of counsel and finding specifically that trial counsel had gone "above and beyond the

call of duty in trying to get [the petitioner] to understand the substantial risk of his unwillingness to assume any responsibility for those drugs found under him during the execution of the search warrant in question." In its detailed and comprehensive 13–page order denying relief, the court also made the following findings with respect to the petitioner's specific allegations of ineffective assistance of counsel:

> [The petition] alleges in a conclusory way that trial counsel failed to conduct an adequate pre-trial investigation. There is no merit to that allegation, because the [p]etitioner's conviction resulted from a second jury trial following an earlier trial in which the jury hung 11 to 1 for conviction. Certainly, at the time of the last trial, defense counsel was well aware of all evidence against the [p]etitioner. In addition, trial counsel testified at the PCR hearing that he worked with attorneys for other defendants at the scene of the [p]etitioner's arrest in trying to produce evidence that the drugs were under the control of someone other than the [p]etitioner. Responses from other attorneys were that their clients' testimony would hurt [the petitioner] more than help him.... This [c]ourt cannot speculate as to whether further investigation would have revealed more witnesses or what their testimony might have been.... Therefore, since the [p]etitioner failed to present such witnesses at the evidentiary hearing, [this claim] is without merit.

> [The petition] criticizes trial counsel for failing to present a defense, specifically not calling a single witness as to the [p]etitioner's character. No character witnesses were called in the PCR hearing, and this [c]ourt has no reason to believe that any effective character witness existed at the time of the trial. The additional allegation ... that there was no evidence of mitigation or family support seems immaterial in that such evidence would not be admissible in a guilt determination phase of the trial. Since the trial court imposed the minimum sentence, there was no need for trial counsel to offer mitigation or family history evidence at any time on behalf of the [p]etitioner.

> [The petition] also alleges that trial counsel should have offered some defense evidence about the [p]etitioner's prior dog sales to show why he may have been at the house being searched for drugs pursuant to a search warrant. Trial counsel could not have pursued that theory in front of the jury because of the outlandish tale the [p]etitioner had presented in his first trial testimony about stopping at and entering this house because he did not have a valid registration plate. In his first trial, he said he had seen several police cars as he approached that block of Ninth Street and concluded that he'd better pull over and try to avoid a driving offense. Any attempt to put on defense evidence about the sale-of-a-dog purpose for the

[p]etitioner being at the crime scene would likely have resulted in the State being able to get in all or part of the [p]etitioner's prior testimony as a totally inconsistent reason.

....

[The petition] alleges that trial counsel did not spend enough time communicating with the [p]etitioner between the first and second trial, but this [c]ourt recalls a good bit of time in open court when even the judge encouraged the [p]etitioner to seriously consider alternatives other than a second trial in light of the fact that eleven jurors in the first trial voted to find the [p]etitioner guilty of an A felony carrying a mandatory minimum of 15 years. There was no particular reason to spend a lot of time on trial preparation itself, and counsel was obviously trying to persuade the [p]etitioner that it was in his best interest to avoid trial, if possible. Any fault for failure to intelligently communicate lies with the [p]etitioner, not with his counsel.

The allegation in [the petition] that ... trial counsel caused him not to testify is without merit because this [c]ourt conducted a hearing with the [p]etitioner during the trial to ensure that he was aware that the decision of whether to testify was his.... The [p]etitioner gave appropriate responses to the [c]ourt's questions and [as]sured that he understood his right to testify or to remain silent.

The factual allegation [that counsel failed to interview witnesses called by the prosecution prior to trial] is not true. [Trial counsel's] testimony showed that he had spoken with officers before the first trial and engaged them in a thorough cross-examination in the first trial, all well before the second trial that resulted in the conviction of which the [p]etitioner complains.

....

[The petition] complains that ... trial counsel did not adequately challenge the distance measurements testified about by the law enforcement officer, but present counsel and the [p]etitioner offered no evidence in the PCR hearing to indicate that the trial evidence of measurement was anything other than correct. ... Since the [p]etitioner failed to present any measurement evidence at his evidentiary hearing, [this claim] is without merit.

Goodrum, 2017 WL 3149646, at **2-8.

**IV.    Standard of Review**

The petition in this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." Woodford v. Garceau, 538 U.S. 202, 206 (2003) (internal citations and quotation marks omitted). As the Supreme Court explained, the AEDPA "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." Burt v. Titlow, 571 U.S. 12, 19 (2013). The AEDPA, therefore, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Id.

One of the AEDPA's most significant limitations on the federal courts' authority to issue writs of habeas corpus is found in 28 U.S.C. § 2254(d). Under the AEDPA, the court may grant a writ of habeas corpus on a claim that was adjudicated on the merits in state court if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 405 (2000).

The state court's factual findings are presumed to be correct and they can be contravened only if the petitioner can show by clear and convincing evidence that the state court's factual findings were erroneous. 28 U.S.C. § 2254(e)(1). As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."

Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (citing Williams, 529 U.S. at 410). Review under § 2254(d) (1) "is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. 170, 182 (2011).

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Baldwin v. Reese, 541 U.S. 27, 29 (2004) (citations omitted). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." Id. (citation omitted); Gray v. Netherland, 518 U.S. 152, 162–63 (1996) (the substance of the claim must have been presented as a federal constitutional claim). This rule has been interpreted by the Supreme Court as one of total exhaustion. Rose v. Lundy, 455 U.S. 509 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. See Picard v. Connor, 404 U.S. 270, 275 (1971); see also Pillette v. Foltz, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review").

Claims which are not exhausted are procedurally defaulted and "ordinarily may not be considered by a federal court on habeas review." Alley v. Bell, 307 F.3d 380, 388 (6th Cir. 2002). "In order to gain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate cause and prejudice for the failure, or that a miscarriage of justice will result from the lack of review." Id. at 386. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. Lucas v. O'Dea, 179 F.3d 412, 418 (6th Cir. 1999) (citing Coleman v. Thompson, 501 U.S. 722, 754 (1991)).

A petitioner may establish cause by "show[ing] that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. Id. Constitutionally ineffective assistance of trial or appellate counsel may constitute cause. Murray, 477 U.S. at 488–89. Generally, however, if a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself have been presented to the state courts as an independent claim before it may be used to establish cause. Id. If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim. Edwards v. Carpenter, 529 U.S. 446, 452-53 (2000).

Petitioners in Tennessee also can establish "cause" to excuse the procedural default of a substantial claim of ineffective assistance by demonstrating the ineffective assistance of post-conviction counsel in failing to raise the claim in initial review post-conviction proceedings. See Martinez v. Ryan, 566 U.S. 1, 5-6 (2012) (creating an exception to Coleman where state law prohibits ineffective assistance claims on direct appeal); Trevino v. Thaler, 569 U.S. 413, 429 (2013) (extending Martinez to states with procedural frameworks that make meaningful opportunity to raise ineffective assistance claim on direct appeal unlikely); Sutton v. Carpenter, 745 F.3d 787, 792 (6th Cir. 2014) (holding that Martinez and Trevino apply in Tennessee). The Supreme Court's creation in Martinez of a narrow exception to the procedural default bar stemmed from the recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." Martinez, 566 U.S. at 13. In other

words, <u>Martinez</u> requires that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding," and that "the underlying ineffective-assistance-of-trial-counsel claim [be] a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." <u>See id.</u> at 13-15. Importantly, <u>Martinez</u> did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in <u>Coleman</u>.

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his <u>actual</u> and substantial disadvantage." <u>Perkins v. LeCureux</u>, 58 F.3d 214, 219 (6th Cir. 1995) (quoting <u>United States v. Frady</u>, 456 U.S. 152, 170 (1982) (emphasis in original)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." <u>Simpson v. Jones</u>, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the Supreme Court also has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. <u>Dretke v. Haley</u>, 541 U.S. 386, 392 (citing <u>Murray</u>, 477 U.S. at 496).

**V.     Analysis**

With these principles in mind, the Court will turn to the examination of the claims raised in Goodrum's petition for habeas relief.

**A.     <u>Batson</u> claim**

First, Petitioner alleges that the State "unfairly sought to strike" an African-American female prospective juror, and that the trial court erred in excusing her in violation of <u>Batson v.</u>

<u>Kentucky</u>, 476 U.S. 79 (1986).  (Doc. No. 1 at 14).   During voir dire, the following exchange took

place between the judge, prosecutor Brent Cooper, and prospective juror Angela Grimes:

> Mr. Cooper:     But do any of you - and I'm not talking about the government in
> general-not just law enforcement, but do any of you have strong
> negative feelings towards law enforcement? Okay. And this is good.
> This is what we want you to do. You're not going to hurt anybody's
> feelings. Okay. Ms. Grimes?
>
> Ms. Grimes:     Yes.
>
> Mr. Cooper:     And would you have problems if all the proof in this case is going
> to come in through law enforcement officers, are you going
> to start off leaning one way or other?
>
> Ms. Grimes:     Yes.
>
> Mr. Cooper:     Would it be fair to say you have at least a certain level of distrust for
> law enforcement? And if that's not a fair statement, tell me that too.
> I'm just guessing.
>
> The Court:      You can pick your own words. You don't have [to] use General
> Cooper's.
>
> Mr. Cooper:     Right, you don't have to use my words.
>
> Ms. Grimes:     I mean, you've got a lot of crooked cops out here, so . . .
>
> Mr. Cooper:     And is that based on something that you personally experienced?
>
> Ms. Grimes:     Uh-huh.
>
> Mr. Cooper:     Like I say, I don't want to go into any details. But would it be fair
> to say that - or let me put it this way. Whenever any witness takes
> the stand, as a juror, you should look at that witness with a blank
> slate. You should have no opinion. Before they start talking, you
> really should have no opinion one way or the other about whether or
> not they're telling the truth. As a juror, part of your job is to decide
> whether or not the witnesses are telling the truth. Okay. And the
> judge will tell you that. He'll tell you the things that you're supposed
> to consider in determining what we call it credibility of witnesses.
> Okay. Your job is to determine the credibility of witnesses, but you
> should have no prior problem about their credibility before they start
> talking. Does that make sense?

| Ms. Grimes: | Yes. |
|---|---|
| Mr. Cooper: | And are you telling us that if a police officer takes the stand, you're already going to have some opinion about whether or not they're telling the truth? Is that right? And like I said, you don't have to use my words. |
| Ms. Grimes: | It really depends. It's kind of hard to say. It just depends. |
| Mr. Cooper: | Okay. I think I know where you're coming from. Does anyone else have strong negative feelings about law enforcement. |

(Doc. No. 10, Attach. 2 at 44-46).

Afterwards, the State used a preemptory challenge to remove Ms. Grimes as a prospective juror. (Id. at 82). The trial court conducted a hearing in chambers after the peremptory challenge was questioned by the defense. (Id. at 82-87). The prosecutor explained that he struck Ms. Grimes because she "[d]istrusts law enforcement" and he knew that Ms. Grimes was related to Kevy Grimes, "a convicted drug dealer" in Maury County. (Id. at 82-86).

In finding that the State had not improperly used its peremptory challenge against Ms. Grimes, the trial court noted that the potential juror had been "more animated than the other jurors about responding" when the prosecutor asked about feelings on law enforcement. (Id. at 83). The court ruled that the State had a race-neutral reason for striking Ms. Grimes, stating:

> But I think under "Batson," the only test here whether or not the State has expressed a race neutral reason for excusing her from the jury in this case. And if he thinks - Mr. Cooper does - through the investigator for the office that's present in here with us now, that she is or has been in a relationship with someone convicted of a drug offense in Maury County; and she's expressed in a more animated way than most other jurors a realization that some policeman may not be believable, or may not be worthy of trust. Then that is a race neutral reason, I'm inclined to believe.

(Id. at 84-85).

On direct appeal, Petitioner argued that the State "unfairly sought to strike" Ms. Grimes, and that the trial court erred in excusing her. Goodrum, 2014 WL 1102011, at *8. The Tennessee

Court of Criminal Appeals began its analysis of Petitioner's claim by identifying <u>Batson</u> as the appropriate standard. <u>Id</u>. In reviewing the trial court's handling of Petitioner's <u>Batson</u> challenge, the state appellate court agreed with the trial court that Petitioner "failed to establish purposeful discrimination or inherent discriminatory intent in the State's exercise of a preemptory challenge to excuse the Prospective Juror." <u>Goodrum</u>, 2014 WL 1102011, at *9. The Tennessee Court of Criminal Appeals affirmed the trial court's decision to permit the state to exercise its preemptory challenge as to this juror, finding the state had presented two race-neutral reasons for exercising a preemptory challenge to excuse the prospective juror, including that she "was particularly 'animated' and vocal in expressing her distrust of law enforcement" and that the state "was previously familiar with the prospective juror in relation to a known drug dealer." <u>Id</u>.

In <u>Batson</u>, the United States Supreme Court held that "the Equal Protection Clause [of the United States Constitution] forbids the prosecutor to challenge potential jurors solely on account of their race...." 476 U.S. at 89. Courts follow a three-step process when adjudicating a <u>Batson</u> claim:

> "First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination."

<u>Davis v. Ayala</u>, __ U.S. __, 135 S. Ct. 2187, 2199 (2015) (quoting <u>Snyder v. Louisiana</u>, 552 U.S. 472, 476–77 (2008)). In establishing a prima facie case of purposeful discrimination, the defendant may rely "solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." <u>Batson</u>, 476 U.S. 79, 96. That is, the defendant need not prove a past pattern of racially discriminatory jury selection practices by the prosecution. <u>Id</u>. at 92-93.

Once the defendant makes out a prima facie case, the State has the burden of producing a neutral explanation for its challenge. Id. at 97. This explanation must be a clear and reasonably specific account of the prosecutor's legitimate reasons for exercising the challenge. Id. at 98 n.20. However, the race or gender-neutral explanation need not be persuasive, or even plausible. Purkett v. Elem, 514 U.S. 765, 767-68 (1995). "'Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" Id. at 768 (quoting Hernandez v. New York, 500 U.S. 352, 360 (1991)).

If the prosecution provides a race-neutral explanation, the trial court must then determine, from all of the circumstances, whether the defendant has established purposeful discrimination. Batson, 476 U.S. at 98. The trial court may not simply accept a proffered race-neutral reason at face value but must examine the prosecutor's challenges in context to ensure that the reason is not merely pretextual. See Miller-El v. Dretke, 545 U.S. 231, 240 (2005). In Miller-El, the Court reiterated that "the rule in Batson provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it." Id. at 251-52. If the trial court determines that the proffered reason is merely pretextual and that a racial motive is in fact behind the challenge, the juror may not be excluded. Id.

Here, the prosecutor knew Ms. Grimes was related to a convicted drug dealer in Maury County and explained that, due to her open distrust for law enforcement, she was an unsuitable juror for this case. (Doc. No. 10, Attach. 2 at 82-86). The trial court determined that these reasons were not pre-textual. Deference should be given to the trial court's rulings since the trial court is in the best position to make credibility determinations regarding a prosecutor's race-neutral explanation. See Miller-El v. Cockrell, 537 U.S. 322, 339-40 (2003) (explaining that the trial court

can assess credibility by the prosecutor's demeanor, by how reasonable or how improbable the explanations are, and by whether the proffered rationale has some basis in accepted trial strategy).

As the Supreme Court explained:

> A federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system. Where 28 U.S.C. § 2254 applies, our habeas jurisprudence embodies this deference. Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2); see also Williams, 529 U.S., at 399, 120 S. Ct. 1495 (opinion of O'CONNOR, J.).

Miller-El, 537 U.S. at 340.

The state appeals court's decision to affirm the lower court's Batson ruling was objectively reasonable. Petitioner has not presented clear and convincing evidence to the contrary. He therefore cannot satisfy his burden of demonstrating that the state appellate court's conclusion represented an unreasonable application of Batson or that it was based on an objectively unreasonable factual determination. Thus, Petitioner is not entitled to relief on this claim.

### B.     Due process claim

Next, Petitioner alleges that his right to due process was violated because "[t]here was no proof put forth by the state that the Petitioner had done any wrong," and, as a result, the trial court erred by sending the case to the jury. (Doc. No. 1 at 15). Respondent contends that this claim is barred by procedural default. (Doc. No. 11 at 13-14).

Petitioner raised this claim on direct appeal, contending that the State did not adduce any evidence of his wrongdoing "other than he was found at a location where drugs were present." Goodrum, 2014 WL 1102011, at *10. Citing Tennessee Court of Criminal Appeals Rule 10(b), the state appellate court found that Petitioner waived the claim because he made "little to no further

argument in support of" the claim and failed "to cite any authority or reference the record to aid [the court's] review." Id. The state appellate court further found that, to the extent the defendant was arguing that the trial court erred in denying his motion for judgment of acquittal, the evidence sufficiently supported the defendant's conviction for possession of .5 or more grams of cocaine with the intent to sell within 1,000 feet of a drug-free zone. Id.

Under the independent and adequate state ground doctrine, a federal habeas claim is procedurally defaulted when: "'(1) the petitioner fails to comply with a state procedural rule; (2) the state courts enforce the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner cannot show cause and prejudice excusing the default.'" Guilmette v. Howes, 624 F.3d 286, 290 (6th Cir. 2010) (quoting Tolliver v. Sheets, 594 F.3d 900, 928 n.11 (6th Cir. 2010)).

In raising this claim before the state appellate court, Petitioner failed to comply with Tennessee Court of Criminal Appeals Rule 10(b), which provides that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). The Sixth Circuit has confirmed that this rule is "an independent and adequate state ground for denying [a] claim." Middlebrooks v. Bell, 619 F.3d 526, 538 (6th Cir. 2010), vacated on other grounds sub nom, Middlebrooks v. Colson, 566 U.S. 902 (2012). See Lewis v. Tenn., 279 Fed. App'x 323, 326 (6th Cir. 2008) (finding procedural default based on state court's application of Tenn. Ct. Crim. App. R. 10(b) and Tenn. R. App. P. 27(a)); Killebrew v. Bernhardt, No. 94-6567, 1995 WL 712761, at *1 (6th Cir. Dec. 1, 1995) (same). Thus, Petitioner's claim is procedurally defaulted.

True, the state appellate court also reviewed Petitioner's due process claim on its merits. However, "[a]n alternative holding in which a state procedural bar is a sufficient basis for the state

court's judgment is adequate to preclude a claim from being raised on habeas review, even when the state court also relies on federal law." <u>Simpson v. Jones</u>, 238 F.3d 399, 408-09 (6th Cir. 2000); <u>see also</u> <u>Michigan v. Long</u>, 463 U.S. 1032, 1041 (1983) (stating, in the context of a direct appeal, that "[i]f the state court decision indicates clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent grounds, we, of course, will not undertake to review the decision"); <u>Harris v. Reed</u>, 489 U.S. 255, 264 n.10 (1989) (applying <u>Long</u> rule to habeas claims, stating that "a state court need not fear reaching the merits of a federal claim in an alternative holding" and further noting that, "[b]y its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law").

Federal habeas review of Petitioner's procedurally defaulted claim is barred unless Petitioner can demonstrate that cause and prejudice will excuse the procedural default or that failure to consider the claim will result in a fundamental miscarriage of justice. <u>See Harris</u>, 489 U.S. at 262; <u>Coe</u>, 161 F.3d at 329-30. Petitioner presents no argument establishing cause and prejudice to excuse the default his claim, and there is no evidence that failure to consider this claim will result in a fundamental miscarriage of justice. Consequently, Petitioner's procedurally defaulted due process claim must be dismissed.

C.     **Sufficiency of the evidence claim**

In his third claim, Petitioner alleges that the evidence was insufficient to sustain his conviction. (Doc. No. 1 at 16). Petitioner argues that the State merely showed that he was "in a home where execution of a search warrant discovered cocaine," which he alleges is insufficient to show actual possession. (<u>Id</u>. at 18). According to Petitioner, "[t]here was no proof put forth by the State … linking him to cocaine discovered, there was no contraband discovered on his person,

there were no statements by the Petitioner against his interest and he was not on trial for any sale that may have occurred previously." (Id.)

The Tennessee Court of Criminal Appeals considered Petitioner's sufficiency of evidence claim. Therefore, this Court must presume the correctness of the state court's factual determinations. 28 U.S.C. § 2254(e)(1). Petitioner may rebut this presumption only with clear and convincing evidence. Warren v. Smith, 161 F.3d 358, 360-61 (6th Cir. 1998).

On sufficiency of the evidence challenges, habeas relief is warranted "only where the court finds, after viewing the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Tucker v. Palmer, 541 F.3d 652, 656 (6th Cir. 2008) (internal quotation omitted); see Jackson v. Virginia, 443 U.S. 307, 319 (1979) ("Instead, the relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt") (emphasis in original).

In considering Petitioner's sufficiency of evidence claims in its opinion, the Tennessee Court of Criminal Appeals began by setting forth the correct legal standard:

> The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn.1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn.1977); Farmer v. State, 208 Tenn. 75, 343 S.W.2d 895, 897 (Tenn.1961)).

<u>Goodrum</u>, 2014 WL 1102011, at *4.

The court next considered the definition of the crime for which Petitioner was convicted:

> To sustain a conviction for this offense, the State was required to prove beyond a reasonable doubt that the Defendant knowingly "possess[ed] [cocaine] with intent to manufacture, deliver or sell [cocaine]." T.C.A. § 39–17–417(a)(4) (2008). A violation of subsection (a) with respect to .5 grams or more of cocaine is a Class B felony. <u>Id</u>. § 39–17–417(c)(1). In addition, the Drug–Free School Zone Act states that a violation of Tennessee Code Annotated section 39–17–417 "that occurs on the grounds or facilities of any school or within one thousand feet (1,000') of the real property that comprises a public or private elementary school, middle school, secondary school, preschool, child care agency, or public library, recreational center or park shall be punished one (1) classification higher than is provided in § 39–17–417(b)–(i) for such violation." <u>Id</u>. § 39–17–432(b)(1) (2008). In other words, a defendant convicted of possession of .5 grams or more of cocaine with the intent to sell, ordinarily a Class B felony, would be punished for a Class A felony if the defendant possessed the drug within 1,000 feet of a public or private elementary, middle, or high school. Subsection (b)(3) specifically exempts parks from incarceration at the higher classification in subsection (b)(1).

<u>Id</u>. at *6.

In challenging the sufficiency of the evidence used to convict him, Petitioner contended that the State failed to establish the elements of possession and intent to sell. He argued that he was merely present at the residence where the drugs were found and that other known drug dealers were also in the area. <u>Id</u>. The state appellate court considered the evidence adduced at trial and concluded that the evidence was sufficient for a reasonable juror to find that Petitioner possessed the drugs at issue within 1,000 feet of a drug free school zone. <u>Id</u>. at *6. Rejecting Petitioner's "wrong place, wrong time" argument, the court found that the evidence showed Petitioner had knowledge he was lying on "contraband narcotics" and, due to his proximity to the crack cocaine, he "had the ability to reduce the drugs to his actual possession." <u>Id</u>. The court further found that the proof showed that the Fleming residence was located with 1,000 feet of a school and park. <u>Id</u>.

The state appellate court further found that the evidence, although largely circumstantial, was sufficient for a reasonable juror to find the defendant guilty of possession with intent to sell.

Id. at *7. Officer Dark testified that Petitioner was found lying on top of 1.7 grams of crack cocaine which had a street value of $340. Id. Further, Officer Dark testified that Petitioner did not have any drug paraphernalia to support a finding of personal use. Id. After viewing the evidence in the light most favorable to the prosecution, the state appellate court ultimately concluded that a rational trier of fact could have found the essential elements of the crime of possession of .5 grams or more of cocaine with the intent to sell within 1,000 feet of a public school beyond a reasonable doubt. Id. at **6-7.

Here, the decision of the Tennessee Court of Criminal Appeals was not an unreasonable application of the facts or contrary to law. Although Petitioner urges here, as he did on direct appeal, that the State did not prove he had actual possession of the drugs, actual possession of the drugs was not required. Under Tennessee law, "[p]ossession may be actual or constructive." State v. Robinson, 400 S.W.3d 529, 534 (Tenn. 2013) (citing State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001)). Constructive possession depends on the totality of the circumstances in each case and may be based on circumstantial evidence. Id. at 534. Constructive possession is established when a person knowingly has "'the power and the intention at a given time to exercise dominion and control over an object, either directly or through others.'" State v. Williams, 623 S.W.2d 121, 125 (Tenn. Crim. App. 1981) (quoting United States v. Craig, 522 F.2d 29, 32 (6th Cir. 1975)). Constructive possession has been defined as "the ability to reduce an object to actual possession.'" Id. at 125 (quoting United States v. Martinez, 588 F.2d 495, 498 (5th Cir. 1979)).

The state appellate court's finding that Petitioner had constructive possession over the bag of crack cocaine was not unreasonable. When Sergeant Haywood secured Petitioner and began to search him, he found that Petitioner was lying on a bag containing a rock-hard substance. He had "the power and intention . . . to exercise dominion and control over" the drugs. Williams, 623

S.W.2d at 125. Petitioner knew he was lying on crack cocaine, and Petitioner's close proximity to the drugs established that he had the ability to actually possess the drugs. Id.

Petitioner maintains that "[t]here was no proof elicited by the State that the Petitioner intended to do anything with the drugs discovered at the home of Raven Fleming" and that "[t]here was no proof … that the Petitioner was promoting the activity nor benefitting in the proceeds." (Doc. No. 1 at 19). However, the State presented evidence from which a reasonable juror could find that Petitioner possessed the cocaine for resale. Officer Dark testified that in his fourteen years of law enforcement, he had arrested hundreds of people who used crack cocaine and "close to 100" people selling crack cocaine; in his experience, a crack dealer would not typically be in possession of a crack pipe, a dealer selling crack would typically sell individual crack rocks out of a larger bag of crack, and a street-level user would typically buy a $20 crack rock from a dealer; when he arrested a typical crack user, he would find one or two $20 crack rocks but not more; he explained that users do not "save up" their crack rocks, a high-end user would buy a gram of crack for $100, and "[o]nce you start getting above a gram, it's usually a dealer buying from a dealer"; and the amount found in Petitioner's possession, 1.7 grams, would equal 17 crack rocks. (Doc. No. 10, Attach. 3 at 40-53, 127-28). The Court finds that the amount of the drugs, the lack of drug paraphernalia and substantial amount of money on Petitioner, and Officer Dark's testimony established that Petitioner had the intent to sell the drugs.

The proof also showed that 504 East 9th Street was located within 1,000 feet of a school zone and a park. Using a computer program provided by the city's planning department, Officer Dark measured the distance between the house to the school and found it to be 872 feet. (Doc. No. 10, Attach. 3 at 80). Mary H. Carter, the supervisor of attendance and discipline with the Maury

County School System, testified that the Horace Potter School was a public school in Maury County in July 2008. (Doc. 10, Attach. 4 at 50-52.)

The Court finds that the decision of the Tennessee Court of Criminal Appeals was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Furthermore, given the evidence and testimony adduced at trial, the Court finds that the state court's decision to reject Petitioner's sufficiency of evidence claim was not an unreasonable application of the law. Petitioner therefore is not entitled to habeas relief on this claim.

**D.     Ineffective assistance of counsel claims**

Petitioner contends that his trial counsel was ineffective for failing to (1) conduct an adequate pre-trial investigation and (2) meet with Petitioner in person between his first and second trials to prepare a defense, including Petitioner's testimony. (Doc. No. 1 at 20-35). Petitioner also alleges that trial counsel's cumulative errors "require[] that petitioner's conviction and sentence be vacated." (Id.)

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees the right of a person accused of a crime to the effective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) deficient performance of counsel and (2) prejudice to the defendant. See Bell v. Cone, 535 U.S. 685, 694-95 (2002). Trial counsel's performance is deficient when it falls below an objective standard of reasonableness. See Strickland v. Washington, 466 U.S. 668, 686-87 (1984); Combs v. Coyle, 205 F.3d 269, 278 (6th Cir. 2000), cert. denied, 531 U.S. 1035 (2000). In assessing performance, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less

than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690-91. Reasonable attorneys may disagree on the appropriate strategy for defending a client. Bigelow v. Williams, 367 F.3d 562, 570 (6th Cir. 2004). The prejudice element requires a petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

A court hearing an ineffective assistance of counsel claim must consider the totality of the evidence. Strickland, 466 U.S. at 695. "The determinative issue is not whether petitioner's counsel was ineffective but whether he was so thoroughly ineffective that defeat was 'snatched from the jaws of victory.'" West v. Seabold, 73 F.3d 81, 84 (6th Cir. 1996) (quoting United States v. Morrow, 977 F.2d 222, 229 (6th Cir. 1992) (en banc)). "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689.

As discussed above, however, federal habeas relief may not be granted under 28 U.S.C. § 2254 unless a petitioner shows that the earlier state court's decision "was contrary to" federal law then clearly established in the holding of the United States Supreme Court, § 2254(d)(1); that it "involved an unreasonable application of" such law; or that it "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d)(1),(2). Thus, when a claim of ineffective assistance of counsel is raised in a federal habeas petition, such as here, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather,

"[t]he pivotal question is whether the state court's application of the <u>Strickland</u> standard was unreasonable." <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011). As the Supreme Court clarified in <u>Harrington</u>:

> This is different from asking whether defense counsel's performance fell below <u>Strickland's</u> standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a <u>Strickland</u> claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the <u>Strickland</u> standard itself.

<u>Harrington</u>, 562 U.S. at 101 (internal quotation marks and citation omitted).

### 1. Trial counsel failed to conduct an adequate pre-trial investigation

Petitioner asserts that his trial counsel was ineffective for failing to conduct an adequate pre-trial investigation. (Doc. No. 1 at 23-26). Specifically, Petitioner argues that counsel failed to interview a potential witness, Jeremy Haywood; failed to investigate prior drug incidents at the Fleming residence; failed to "independently measure[] the distance between the house and the 'park' and 'school' to determine if the police accurately introduced the Drug Free School Zone element to the charges"; failed to investigate mitigation evidence; failure to investigate Petitioner's reasons for being at the Fleming residence; and failed to request an investigator. (<u>Id</u>. at 24-25).

#### a. Counsel's failure to interview Sergeant Haywood

According to Petitioner, trial counsel was constitutionally ineffective by failing to interview Sergeant Haywood before Petitioner's second trial. Petitioner argued this same point in his post-conviction petition. The post-conviction court denied relief, finding that the petition alleged "in a conclusory way" that counsel failed to conduct an adequate pre-trial investigation

and "[t]here is no merit to that allegation" because, at the time of the second trial, "defense counsel was well aware of all evidence against" Petitioner. <u>Goodrum</u>, 2017 WL 3149646, at *6.

On appeal of the denial of post-conviction relief, the Tennessee Court of Criminal Appeals set forth the governing legal standard for claims of ineffective assistance of counsel. <u>Id</u>. at *8. Applying <u>Strickland</u> to the facts of Petitioner's case, the Tennessee Court of Criminal Appeals then agreed with the post-conviction court that trial counsel's performance was not deficient or prejudicial, finding that "[t]rial counsel's explicitly accredited testimony established that he conducted a thorough pretrial investigation and properly prepared for trial, having effectively communicated with the petitioner and sufficiently advised him regarding his right to testify." <u>Id</u>.

These findings were not unreasonable. Trial counsel testified that he had spoken briefly with Sergeant Haywood prior to the trial. <u>Id</u>. at *3. Counsel was familiar with Sergeant Haywood's expected testimony at the second trial because he had cross-examined Sergeant Haywood during Petitioner's first trial, and Sergeant Haywood's testimony during Petitioner's second trial was consistent with his testimony during Petitioner's first trial. Petitioner has failed to show how better preparation for trial would have resulted in a reasonable probability of a different trial outcome considering the evidence against him. <u>See</u> <u>Kelley v. United States</u>, No. 1:13-cv-70, 1:08-cr-51, 2014 WL 2921821, at *14 (E.D. Tenn. June 27, 2014) (holding that petitioner's unsupported claims of what counsel failed to do, without any evidence of what a more thorough investigation would have revealed, was insufficient to demonstrate by a preponderance of the evidence that counsel performed deficiently; moreover, even assuming that counsel performed deficiently, petitioner failed to establish a reasonable probability, that had counsel conducted a more extension investigation, the outcome of Petitioner's case would have been different). The Sixth Circuit has instructed that when "one is left with pure speculation on whether

the outcome of [the criminal proceeding] could have been any different, [there is] an insufficient basis for a successful claim of prejudice." Baze v. Parker, 371, F.3d 310, 322 (6th Cir.2004), cert. denied, 544 U.S. 931 (2005).

The Court finds that Petitioner has not shown he is entitled to relief on this claim because the state appellate court's determination was not contrary to Strickland. Neither was the court's determination based on an unreasonable application of the facts or an unreasonable application of Strickland's standard to those facts. Thus, Petitioner is not entitled to relief on this claim.

### b. Counsel's failure to investigate prior drug incidents at Fleming residence

Petitioner next alleges that trial counsel was ineffective by failing to investigate prior drug incidents occurring at the Fleming residence. According to Petitioner, this investigation "could have been used to create a defense, prove greater culpability of the co-defendants in actually possession [sic] and selling drugs, introduce a prior history of drug possession and sales of all other parties charged other than Petitioner." (Doc. No. 1 at 25). Petitioner maintains that "[t]he jury deserved to know the history of these other co-defendants['] drug sales and dealing to include in their deliberations of whether Petitioner was actually guilty." Id.

At Petitioner's post-conviction hearing, trial counsel testified that he was aware that there had been a "prior incident" in Raven Fleming's house shortly before the incident giving rise to Petitioner's arrest, but he did not know that Ms. Fleming's residence had been searched and that she had been charged with possession with intent to sell cocaine just three weeks prior to Petitioner's arrest at her house. Goodrum, 2017 WL 3149646, at *2. Trial counsel further testified that,

> [b]ased on [the petitioner's] direction to me, he felt that Mr. Fitzgerald was the most culpable individual in the home that night. He felt there was a possibility Mr. Fitzgerald will take the fall or take the blame for what happened to [the petitioner]. Based on that, I sent a letter to [Mr. Fitzgerald's attorney] asking for permission to

talk to Mr. Fitzgerald. Again, I did get the discovery. [The attorney] provided me
that. In short, [the attorney's] indication to me was nothing good is going to come
out of a discussion. He doesn't have anything good to say about [the petitioner]. It's
going to be detrimental to his case. I advised [the petitioner] of that and that's the
last I heard about Mr. Fitzgerald.

Id. at *4.

The post-conviction court found that there was "no merit" to Petitioner's allegation that trial counsel failed to conduct an adequate pre-trial investigation. Id. at *6. The court noted counsel's testimony at the post-conviction hearing that he had worked with attorneys for the other defendants at the scene of Petitioner's arrest in trying to produce evidence that the drugs were under the control of someone other than Petitioner, but the attorneys' responses "were that their clients' testimony would hurt [Petitioner] more than help him." Id. The Tennessee Court of Criminal Appeals found that the record "fully supports" the denial of relief and, "[g]iven the overwhelming evidence against the petitioner, he cannot establish that, but for counsel's alleged errors, the outcome would have differed." Id. at *8.

Indeed, Petitioner has failed to demonstrate how better preparation for trial in this context would have resulted in a reasonable probability of a different trial outcome considering the evidence against him. Neither has he convinced the Court that the evidence he believes trial counsel should have obtained would have been admissible. Even if Petitioner had established that trial counsel's preparation and investigation were constitutionally deficient, the state courts' conclusion that Petitioner had not demonstrated prejudice as a result of the failure of counsel was not an unreasonable application of clearly established federal law, nor was it based upon an unreasonable application of the facts in light of the evidence before the state court. This claim is without merit and will be dismissed.

### c.     Counsel's failure to independently verify distances

Petitioner additionally alleges that counsel was ineffective for failing to "independently measure[] the distance between the house and the 'park' and 'school' to determine if the police accurately introduced the Drug Free School Zone element to the charges." (Doc. 1 at 25).

At Petitioner's post-conviction hearing, Officer Dark testified that he used a computer program provided by the city's planning department to measure the distance between the residence and the park and school.  (Doc. No. 10, Attach. 3 at 80).  Officer Dark further testified that he then personally measured the distance between the relevant points using a counter wheel with a tape measure and verified that the computer measurements were accurate.  (Doc. No. 10, Attach. 13 at 66).  Verifying the distance using these two different methods of measurement, Officer Dark testified that 504 East 9th Street "was located within a 1,000 feet radius of both Frierson–Johnson Park and College Hill School."  (Id.)

Trial counsel conceded that he had not independently measured the distance between Ms. Fleming's residence and the park and the school but that he had used an online resource to compare the distances between the relevant points.   Goodrum, 2017 WL 3149646, at *3.   He further testified that he believed he had checked the licensure of the park in question prior to trial, but he could not specifically recall doing so.  Id.

In denying relief, the post-conviction court noted that "Petitioner and his current counsel are correct that a police officer should not be allowed to take a distance from Google maps and testify as to its authenticity, without some independent verification by the officer of its reliability and authenticity."  (Doc. No. 10, Attach. 13 at 66).  The court found that Officer Dark, however, had independently verified the location using two different methods, and his methods "were sufficiently reliable to justify admissibility and let the jury decide whether such evidence

established beyond a reasonable doubt that the Petitioner was within 1,000 feet of the school at the time of his arrest." (Id. at 66-67). The court also found that Petitioner had offered no evidence in the post-conviction hearing to indicate that the trial evidence of measurement was anything other than correct and, given that Petitioner had failed to present any measurement evidence at his evidentiary hearing, the claim was without merit. (Id.)

On appeal of the denial of post-conviction relief, the Tennessee Court of Criminal Appeals affirmed. Goodrum, 2017 WL 3149646, at *8. Given the record and Petitioner's continued failure to demonstrate that the trial evidence of measurement was incorrect, the state appellate court's adjudication of this issue was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the record before the state court. Petitioner has not established that trial counsel's failure to independently measure the distance between the Fleming residence and the park and school was constitutionally deficient. This claim is without merit and will be dismissed.

### d.        Trial counsel's failure to investigate mitigation evidence

Petitioner alleges that trial counsel was ineffective because he failed to investigate mitigation evidence, such as Petitioner's former employment or where he attended church. (Doc. No. 1 at 26).

At Petitioner's post-conviction hearing, when asked if he had attempted to verify Petitioner's employment or church membership for purposes of mitigation, trial counsel responded "that he would not have done so for trial but that he would have for sentencing if he had not been able to successfully negotiate the minimum available sentence for the petitioner." Goodrum, 2017 WL 3149646, at *3. In denying relief to Petitioner, the post-conviction court held:

> [The petition] criticizes trial counsel for failing to present a defense, specifically not calling a single witness as to the [p]etitioner's character. No character witnesses

> were called in the PCR hearing, and this [c]ourt has no reason to believe that any
> effective character witness existed at the time of the trial. The additional allegation
> ... that there was no evidence of mitigation or family support seems immaterial in
> that such evidence would not be admissible in a guilt determination phase of the
> trial. Since the trial court imposed the minimum sentence, there was no need for
> trial counsel to offer mitigation or family history evidence at any time on behalf of
> the [p]etitioner.

Id. at 6.    The state appellate court affirmed, finding that Petitioner "failed to prove by clear and

convincing evidence any facts that demonstrate that trial counsel's representation was deficient or

prejudicial." Id. at *8.

The state courts' findings were not unreasonable.  Just as Petitioner did not put on any

evidence that the measurements adduced at trial were incorrect, Petitioner did not put on any

character witnesses at his post-conviction hearing.  Thus, his unsupported claims of what counsel

failed to do, without any evidence of what a more thorough investigation would have revealed, are

insufficient to demonstrate that counsel performed deficiently.  See Baze, 371 F.3d 310, 322.

Moreover, Petitioner's claim that trial counsel performed deficiently by failing to investigate and

introduce any mitigating evidence cannot prevail because such evidence would not have been

admissible during the guilt phase of his trial; furthermore, because the court imposed the minimum

sentence against Petitioner, there was no need for the counsel to offer mitigation evidence during

the sentencing phase.  The  Court finds that the state court's determination was not contrary to

Strickland.  Neither was the court's ineffective assistance determination based on an unreasonable

determination of the facts or an unreasonable application of Strickland's standards to those facts.

Thus, Petitioner is not entitled to relief on this claim.

### e.    Trial counsel's failure to investigate Petitioner's reasons for being at the Fleming residence

Petitioner alleges that trial counsel was ineffective because he failed to investigate

Petitioner's reasons for being at the house where the incident took place.  (Doc. No. 1 at 26).

In his petition for post-conviction relief, Petitioner argued that trial counsel should have offered some defense evidence about Petitioner's prior dog sales to show why he may have been at the Fleming residence.  Goodrum, 2017 WL 3149646, at *7.   The post-conviction court flatly rejected relief on this claim, finding that

> [t]rial counsel could not have pursued that theory in front of the jury because of the outlandish tale the [p]etitioner had presented in his first trial testimony about stopping at and entering this house because he did not have a valid registration plate. In his first trial, he said he had seen several police cars as he approached that block of Ninth Street and concluded that he'd better pull over and try to avoid a driving offense. Any attempt to put on defense evidence about the sale-of-a-dog purpose for the [p]etitioner being at the crime scene would likely have resulted in the State being able to get in all or part of the [p]etitioner's prior testimony as a totally inconsistent reason.

Id.  The Tennessee Court of Criminal Appeals affirmed, finding that "[t]rial counsel's decision to advise the petitioner against testifying in the second trial was based on the need to protect the petitioner against damaging impeachment, given the change in petitioner's story between trials, and we will certainly not second-guess this reasonable—and advisable—trial strategy."  Id. at *8.

The Court finds that Petitioner has not shown that he is entitled to relief on this claim because the appellate court's determination was not contrary to Strickland.   Neither was the appellate court's determination based on an unreasonable determination of the facts or an unreasonable application of Strickland's standards to those facts.  Counsel made a strategic choice not to investigate Petitioner's dog-sale story because of the likelihood that Petitioner would contradict his prior testimony if he testified to that story at his second trial.  It is a "longstanding and sound principle that matters of trial strategy are left to counsel's discretion."  Dixon v. Houk, 737 F.3d 1003, 1012 (6th Cir. 2013).  In order to fairly assess an attorney's performance, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's

perspective at that time." Strickland, 466 U.S. at 689. "[S]trategic choices made after a thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable." Id. at 690.

Further, state courts' determination are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary, see 28 U.S.C. § 2254(e)(1), which Petitioner has not submitted. This claim is without merit and will be dismissed.

### f. Trial counsel's failure to request an investigator

Petitioner alleges that trial counsel was ineffective because he failed to request an investigator to assist him with the case. (Doc. No. 1 at 26).

During Petitioner's post-conviction hearing, trial counsel testified that he had not requested the aid of an investigator in Petitioner's case because counsel had interviewed Officers Dark and Gray and he had spoken briefly with Sergeant Haywood prior to trial. Goodrum, 2017 WL 3149646, at *3. In denying relief, the post-conviction court held that

> [t]he factual allegation [that counsel failed to interview witnesses called by the prosecution prior to trial] is not true. [Trial counsel's] testimony showed that he had spoken with officers before the first trial and engaged them in a thorough cross-examination in the first trial, all well before the second trial that resulted in the conviction of which the [p]etitioner complains.

Id. at *7. The Tennessee Court of Criminal Appeals applied Strickland and affirmed, concluding that the evidence in the record supported the post-conviction court's conclusion that trial counsel's performance was not deficient or prejudicial. Id. at *8.

The state courts' findings were not unreasonable. Counsel testified that he did not feel an investigator was needed due to his familiarity with Dark, Gray, and Haywood's testimonies, given the first trial. Petitioner does not explain what a more thorough investigation would have revealed. See Kelley, 2014 WL 2921821, at *14. Accordingly, the Court finds that the state court's decision

was based on a reasonable determination of the facts and that the state court's application of the Strickland factors was reasonable. Petitioner therefore is not entitled to relief on the basis of this claim.

### 2. Trial counsel never met with Petitioner "in person" between his first and second trials to prepare Petitioner's trial testimony

Petitioner alleges that trial counsel was ineffective by failing to "adequately prepare for trial and present a defense" because never met with Petitioner "in person" between his first and second trials. (Doc. 1 at 27-31). Specifically, Petitioner alleges that, after Petitioner testified in the first trial, trial counsel sent Petitioner a letter recommending that Petitioner should not testify at the second trial, but never met with Petitioner in person to discuss the letter or Petitioner's testimony at the second trial until the day of the second trial. (Id. at 27). Essentially, Petitioner asserts that his trial counsel was ineffective for failing to "adequately communicate with [him] and [for failing to] protect his constitutional right[s] regarding testimony." (Id. at 31-35).

The constitutional right of a defendant to testify at trial is well established and subject only to a knowing and voluntary waiver by the defendant. Rock v. Arkansas, 483 U.S. 44, 49 (1987). Defense counsel's role is to advise the defendant whether to take the stand; ultimately, the defendant must decide for himself. See Pelzer v. United States, No. 96-1195, 1997 WL 12125, at *2 (6th Cir. Jan. 13, 1997) (citation omitted).

During Petitioner's post-conviction hearing, trial counsel testified that, prior to Petitioner's second trial, counsel recalled speaking with Petitioner by telephone and meeting him with him in counsel's office on "at least four different" occasions. Goodrum, 2017 WL 3149646, at *3. Trial counsel conceded that there "were probably some times [the petitioner] would call ... to speak with me" when counsel was unavailable but that he "never refused access to" the petitioner and would work out "a later time" to speak with the petitioner. Id. Trial counsel stated

> Mr. Goodrum and I stayed in contact . . . once that first trial came up, you know, again, we gone through everything, we'd shown all of our cards, we've already the best on my ability. Other than just staying in touch with court dates and this is coming up, there's really not a lot that's going to change.

Id.

With respect to Petitioner's decision to testify at the second trial, trial counsel testified that he had discussed Petitioner's options with him until they had "beat[en] that horse to death." Id. Trial counsel acknowledged that he had sent a letter to Petitioner in January 2012, nearly three months prior to trial, advising Petitioner of the potential perils of testifying in the second trial and enclosing a copy of Petitioner's testimony from the first trial. Id. Trial counsel explained

> the purpose of this letter, there was–I had a copy of the transcript attached to this. I wanted [the petitioner] to be aware of that. I knew if he were to take the stand on trial number two, again, he was under oath, there's [a] detailed document that the State would be able to cross-examine. If he got off track on what he had testified earlier, you know, the State was just going to make mincemeat out of him in front of a jury. Again, if he were ready–and, again, that's his decision, not mine, but if he so chose, you know, again, this was in January. I wanted him to be aware of it, have a chance to review it so there wouldn't be any surprises if, in fact, he decided to testify at the second trial.

Id. Trial counsel testified that he orally advised Petitioner against testifying in the second trial but made it clear that the decision was his alone. Id.

Petitioner testified at his post-conviction hearing that he did not have the opportunity to speak with trial counsel very often and that he had sought new counsel because he "was left in the dark" and counsel failed to "take time to explain" things to Petitioner. Id. at *5. Petitioner testified that trial counsel never visited him while he was incarcerated, but Petitioner conceded that he was out on bond for almost four years. Id. According to Petitioner, he drove to trial counsel's office "10 or 15 times" over a period of several months but he was never able to meet with trial counsel. Id. He testified that trial counsel did not include a copy of his testimony from the first trial when counsel sent the letter advising Petitioner about the perils of testifying in the second trial. Id.

Petitioner claimed that he "assume[d]" he would testify in the second trial because he had done so in the first trial but that counsel informed him "[a]bout 10 minutes before we came into the courtroom [that] it would be in [his] best interest not to testify," so he was simply following his attorney's advice when he chose not to testify.  Id.

Petitioner acknowledged that he had "the option to testify" and that he had announced in court that he did not wish to testify.  Id. at *6.  Petitioner also conceded that he sent a letter to trial counsel nearly six months after he was convicted at the second trial which stated, in part:

> Let me start by saying you did me proud in court and I was glad to see your representation on this day because you touched a lot of good points in my case and truthfully this is going to be a waste of the taxpayers['] money.

Id. at *6.

Petitioner challenged the effectiveness of his trial counsel on these same grounds during his state post-conviction proceedings.  In denying relief, the post-conviction court rejected Petitioner's claim that counsel did not spend enough time communicating Petitioner between his first and second trials.  Goodrum, 2017 WL 3149646, at *7. The court found that there was "no particular reason" for trial counsel to spend a lot of time on trial preparation itself and counsel was "obviously trying to persuade the [p]etitioner that it was in his best interest to avoid trial, is possible."  Id. The court concluded that "[a]ny fault for failure to intelligently communicate lies with the [p]etitioner, not with his counsel."  Id.

In rejecting Petitioner's claim that trial counsel performed deficiently because he caused Petitioner not testify at his second trial, the court noted that it had "conducted a hearing with the [p]etitioner during the trial to ensure that he was aware that the decision of whether to testify was his" and  Petitioner had given  "appropriate responses to the [c]ourt's questions and [as]sured that he understood his right to testify or to remain silent."  Id.  The Tennessee Court of Criminal

Appeals affirmed on appeal. Id. at *8.    Applying the governing legal standard set forth in Strickland, the state appellate court found that Petitioner's trial counsel "conducted a thorough pretrial investigation and properly prepared for trial, having effectively communicated with the petitioner and sufficiently advised him regarding his right to testify." Id.

Importantly, Petitioner does not now contend that trial counsel failed to communicate with him *at all* between his first and second trials.  Instead, Petitioner contends that trial counsel was ineffective because he communicated with Petitioner largely by mail.  Petitioner believes that counsel should have met with him personally to prepare his defense.  Trial counsel testified that he clearly remembered meeting with Petitioner in person in his office at least four times in between the first and second trial.  (Doc. No. 10, Attach. 14 at 31).  Trial counsel further testified that the State's proof had not changed from the first trial to the second trial and, as a result, there was not really much to discuss about the case other than upcoming court dates and whether Petitioner would testify at the second trial.  (Id. at 31-32).  Counsel explained

> [b]y the time a case comes into a trial, especially a jury trial, especially a trial of
> that kind of magnitude, you know, I've said I've talked, I've prepared.  I've done
> everything that I can do regarding doing the best I can for a client.

(Doc. No. 10, Attach. 14 at 45).  Counsel communicated with Petitioner in between the first and second trials about the serious nature of his charges, the risk of conviction at trial, his recommendation for Petitioner to accept the State's initial plea offer of a misdemeanor sentence, and the perils of testifying at the second trial.  (Doc. No. 10, Attach. 16 at 14, 21-22).

During his second trial, Petitioner never objected to or expressed dissatisfaction with not having testified. There is no evidence in the trial record of a disagreement between trial counsel and Petitioner over whether he should testify.  "Although the ultimate decision whether to testify rests with the defendant, when a tactical decision is made not to have the defendant testify, the

defendant's assent is presumed." United States v. Webber, 208 F.3d 545, 551 (6th Cir. 2000) (citation omitted). Likewise, defense counsel is presumed to follow the professional rule of conduct and "strongly presumed to have rendered adequate assistance" in carrying out the general duty "to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." Strickland, 466 U.S. at 688-90.

The trial and post-trial record do not support Petitioner's assertions that his attorney failed to discuss adequately the option of Petitioner testifying with him and/or refused to allow Petitioner to testify. The record demonstrates that Petitioner agreed he should not testify. Given these facts, the Tennessee Court of Criminal Appeal's adjudication of this issue was neither contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence. This claim is without merit and will be dismissed.

### 3. Trial counsel's cumulative errors

Petitioner also alleges that counsel's cumulative errors "require[] that petitioner's conviction and sentence be vacated." (Doc. No. 1 at 20). However, the law of this Circuit is that cumulative error claims are not cognizable on habeas review. See Daniels v. Jackson, No. 18-1342, 2018 WL 4621942, at *6 (6th Cir. July 17, 2018) (quoting Williams v. Anderson, 460 F.3d 789, 816 (6th Cir. 2006)) ("[T]he law of [the Sixth Circuit] is that cumulative error claims are not cognizable on habeas [review] because the Supreme Court has not spoken on this issue."). Petitioner's claim is not cognizable and therefore must be dismissed.

### E.    Constitutionality of Tennessee's drug-free school zone law

Finally, Petitioner claims that the State's application of the Tennessee Drug–Free School Zone Act violated his constitutional rights to due process and equal protection because "it cause[d] him to be treated differently from another person charged with possessing drugs at a fraction of an inch beyond 1000 feet of a school or other prohibited location and causes a distant difference in his liberty by eliminating the mandatory time to serve." (Doc. No. 1 at 38).

Petitioner raised this claim on direct appeal. Goodrum, 2014 WL 1102011, at *10.  In its decision, the Tennessee Court of Criminal Appeals noted that the court previously had addressed constitutional challenges to the Drug-Free School Zone Act and had concluded that the Act does not violate constitutional protections of due process, equal protection, and prohibitions against cruel and unusual punishment.  Id. at *11 (citing State v. Jenkins, 15 S.W.3d 914 (Tenn. Crim. App. 1999) and State v. Smith, 48 S.W.3d 159 (Tenn. Crim. App. 2000)).  Seeing "no reason to depart from [its] prior holding that the scope of the Act is rationally related to the State's legitimate interest in protecting vulnerable persons from the dangers incident to illegal drug activity," the state appellate court denied relief.  Id.

In United States v. Cross, 900 F.2d 66, 68-69 (6th Cir. 1990) , the Sixth Circuit found that drug-free school zone statutes are constitutional.  Id. at 68-69  (holding that federal school zone statute does not violate due process or equal protection).  Other courts have similarly held.  See e.g., United States v. Campbell, 935 F.2d 39, 45 (4th Cir. 1991) (upholding federal school zone statute because it was "rationally related to a legitimate government interest—keeping drugs away from the nation's schools."); United States v. Rowe, 911 F.2d 50, 51-52 (8th Cir. 1990) (rejecting due process and equal protection challenges to the federal "schoolhouse statute"); United States v. Holland, 810 F.2d 1215, 1218-24 (D.C. Cir. 1987) (rejecting both due process and equal protection

challenges to federal statute imposing enhanced punishment upon those convicted of distributing controlled substances with 1,000 feet of school); United States v. Aguilar, 779 F.2d 123, 125-26 (2d Cir. 1985) (holding that "schoolyard" provision of federal drugs laws increasing penalties for distribution of narcotics within 1,000 feet of a public or private elementary or secondary school does not violate due process or equal protection rights).

Petitioner argues that he should not have been convicted under the Drug-Free School Zone Act because, "on the day of [the] alleged offense school was out for the summer, and there [were] no children at the house where the alleged incident took place." (Doc. No. 1 at 38). Petitioner made a similar argument on direct appeal. Goodrum, 2014 WL 1102011, at *10. The Tennessee Court of Criminal Appeals found that, "'[t]he language of the Act unambiguously imposes enhanced criminal penalties for drug offenses occurring inside the school zone regardless of the timing of the drug offense.'" Id. at *11 (quoting State v. Smith, 48 S.W.3d 159, 169 (Tenn. Crim. App. 2000)); see also State v. Jenkins, 15 S.W.3d 914, 918 (Tenn. Crim. App. Oct. 28, 1999) ("[W]e disagree with the defendant's suggestion that the statute should be, as a constitutional matter, enforced only when children are actually attending school during the regular school year.")).

Petitioner cannot show that the state court's adjudication on this issue was contrary to or an unreasonable application of clearly established federal law, or that it was it based on an unreasonable determination of the facts in light of the evidence. Petitioner's claim, therefore, must be dismissed.

## VI. Conclusion

For the reasons set forth herein, the petition filed by Michael Goodrum seeking relief under § 2254 will be denied, and this action will be dismissed with prejudice.

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller–El, 537 U.S. at 327. The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

Because jurists of reason would not disagree with the resolution of Petitioner's claims, the court will deny a COA.

An appropriate Order will be entered.

_____
WAVERLY D. CRENSHAW, JR
CHIEF UNITED STATES DISTRICT JUDGE